**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **NICK ESCAMILLA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. |
| ) | |
| **JOHN HALLORAN, KENNETH BOUDREAU,** ) | |
| **JAMES O'BRIEN, BERNARD RYAN, ROBERT** ) | |
| **A. MCGUIRE, GERRY CARROLL, ELLYN** ) | |
| **WEISS, ASSISTANT STATE'S ATTORNEY** ) | |
| **PAUL SABIN, ASSISTANT STATE'S** ) | |
| **ATTORNEY SHERRY BIEDER, CITY OF** ) | |
| **CHICAGO, and COOK COUNTY.** ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

Plaintiff, NICK ESCAMILLA, by his undersigned attorney, for his complaint against

former Chicago Police Detectives John HALLORAN, Kenneth BOUDREAU, James O'BRIEN,

Bernard RYAN, Robert A. MCGUIRE, Gerry CARROLL, Ellyn WEISS, Assistant State's

Attorneys Paul SABIN, and Sherry BIEDER, and the CITY OF CHICAGO, and COOK

COUNTY.

## INTRODUCTION

1.      Plaintiff, Nick Escamilla, spent over 14 years incarcerated in the Illinois

Department of Corrections for the 1993 murder of Hector Olague – a crime he did not commit.

2.      In and around February 1993, the Defendants conspired among themselves and

with others, known and unknown, to prosecute Plaintiff for the murder of Olague while

indifferent to the fact that he was innocent.

3.     The Defendant Officers fabricated evidence, namely witness statements and Plaintiff's confession that was used at trial to wrongly convict Plaintiff.

4.     Defendants SABIN and BIEDER, both felony review assistant Cook County State's Attorneys, while acting in an investigatory function and without any probable cause to believe Plaintiff committed the crime, conspired between each other and the defendant officers to procure a fabricated statement from a witness and fabricated confession from Plaintiff.

5.     All of the defendants concealed the fact that they had conspired to and did frame Plaintiff for the murder by coercing, threatening, and manipulating witnesses into making false statements implicating Plaintiff in the murder, and by physically coercing a fabricated court-reported statement from Plaintiff that he signed under duress.

6.     No eyewitnesses to the murder identified Plaintiff as a perpetrator, and no physical evidence connected him to crime. Without the Defendants' concealment of evidence, falsification of evidence, manipulation of witness testimony, and physical coercion of Plaintiff's false inculpatory statements, Plaintiff would never have been convicted.

7.     Since the day of his arrest, Plaintiff fought to prove his innocence while the Defendant Officers continued to frame countless men and lie about it under oath. Indeed, two of the Defendant Officers in this case, Defendants HALLORAN and O'BRIEN previously invoked their Fifth Amendment right against self-incrimination in response to questions about whether they framed the Plaintiff. The Defendants in this case are among the most notorious, repeat offenders in the history of the Chicago Police Department and responsible for untold numbers of wrongful convictions.

8.     On October 31, 2023, Cook County Circuit Court Judge Carol Howard vacated Plaintiff's convictions at the request of the State. That same day, the State moved for an order to

*nolle prosequi* the charges against Plaintiff. Plaintiff served his entire sentence of 29 years' imprisonment. On June 12, 2024, Plaintiff received a Certificate of Innocence

9.     Plaintiff now seeks compensation for the incalculable hardship and injury he suffered as a result of the Defendants' egregious misconduct.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

12.     Nick Escamilla is a -year-old man, is a citizen of the United States, and resides in Chicago, Illinois. Mr. Escamilla spent 15 years incarcerated in the Illinois Department of Corrections for a murder he did not commit.

13.     At all relevant times hereto, Defendants former Detectives Kenneth Boudreau (#17998 or 20435), John Halloran (#20453), James O'Brien (#20466), Gerry Carroll (#20346) Bernard Ryan (#20867), Robert A. McGuire (#20128) Ellyn Weiss (#20264) were members of the Chicago Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder.

14.     Defendants Paul Sabin and Sherry Bieder, at all relevant times, were Assistant Cook County State's Attorneys. Defendants Sabin and Bieder, while acting in an investigatory fashion, procured a fabricated statement from Plaintiff. Defendants are sued for conspiring with

the Defendant Detectives and Officers to frame Plaintiff while acting in an investigatory capacity and without probable cause to believe that Plaintiff committed a crime.

15.     Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

16.     Defendant Cook County is a governmental entity within the State of Illinois which provides funding for the Cook County State's Attorney's Office, which is responsible for paying any judgment entered against the Defendant Assistant State's Attorneys Sabin and Bieder.

17.     Each of the individual Chicago Police Officer Defendants and Assistant State's Attorney Defendants are sued in his or her individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

18.     On February 2, 1993, at roughly 12:30 p.m., 19-year-old, Hector Olague was shot and killed in a parking lot at 5004 South Archer near Curie High School in Chicago, Illinois. Plaintiff was home with his pregnant wife and daughter at the time of the shooting.

19.     In the immediate aftermath of the shooting, Chicago police officers rounded up over a dozen teenagers who were outside at the time of the shooting and brought them to Area One Violent Crimes located at 51st and Wentworth for questioning.

20.     The teens were placed in interrogation rooms; they were not permitted to contact their parents and were not free to leave. They were treated like suspects and were questioned outside the presence of a Youth Officer or a parent. The teenagers were threatened with

continued incarceration until they started providing information about the shooting – even if they had no information to provide.

21.     Rafael Robinson, 15 years old, told the Defendants that before the shooting he saw a brown car stopped at a red-light. The occupants of the car were flashing Two-Six gang signs at members of the Latin Kings street gang who were standing on the corner. One of the Latin Kings threw a brick at the car as it drove away.

22.     About 10 minutes later, Robinson saw the same car and observed two of the Two-Sixers from the brown car in an alley adjacent to the parking lot across the street from Curie High School. They were being chased by Latin Kings. He observed one of the Two-Sixers pull out a gun and then heard shots fired. The shooter was described as a teenager (16-17 years old) wearing a Georgetown pullover.

23.     The case started going cold with no legitimate leads.

**A.     Defendants Coerce a False Statement from John Willer**

24.     On February 9, 1993, Defendants HALLORAN and BOUDREAU arrested 18-year-old John Willer, a Two Six street gang member.

25.     Defendants HALLORAN and BOUDREAU agreed to close the Olague murder investigation by coercing a statement from Willer, either by forcing him to implicate himself or by forcing him to falsely implicate other Two-Six gang members.

26.     Over the course of 24 hours, the Defendant Officers physically assaulted Willer, threatened to falsely charge Willer with Olague's murder, and eventually persuaded him to adopt a false story implicating Plaintiff and Miguel Morales as the perpetrators to save his own skin. John Willer repeatedly told the Defendant Officers that he had no knowledge of the shooting.

27.     The Defendant Officers initially attempted to force Willer to falsely claim he witnessed the shooting, but Willer pushed back. Eventually he agreed to falsely claim that Two-Sixer Miguel Morales admitted to shooting at Latin Kings.

28.     The Defendant Prosecutors interviewed Willer at Area One. They knew he had been in custody for a protracted period of time. Willer told the Prosecutor Defendants that he was being forced to say things by the Defendant Officers who were mistreating him. Willer told the Prosecutor Defendants that he had no knowledge about the shooting.

29.     The Defendant Prosecutors did not memorialize this information and walked out of the interrogation room only to allow the Defendant Officers to resume their abuse of Willer.

30.     Defendants HALLORAN, BOUDREAU, and O'BRIEN continued their oppressive interrogation of Willer. They yelled at him repeatedly, used profanities toward him, promised that they would lock him up if he did not cooperate by parroting back the false narrative that they were feeding to him. The Defendant Prosecutors were at Area One and heard the coercive interrogation and did nothing to intervene to stop it. The Defendants did not permit Willer to make any phone calls, use the bathroom, or provide him with any food.

31.     Exhausted by the lengthy and abusive interrogation, Willer eventually agreed to fabricate evidence that falsely implicated Plaintiff and his criminal co-defendant Miguel (Michael) Morales ("Morales"). Only after Willer capitulated was he provided with any food.

32.     The Defendant Officers with the help of Defendant Prosecutors manufactured a false story that Morales had called Willer on the telephone and confessed to Willer that he had carried out the shooting with the help of Plaintiff. The Defendant Officers HALLORAN and BOUDREAU along with the Defendant Prosecutors interviewed Willer to coach his false story

before the Defendant Prosecutors drafted it up in written form. The statement was false and fabricated, and the Defendants knew it because Willer told them it was not true.

33.     Willer eventually signed a handwritten statement claiming that on February 3, 1993, the day after the shooting, Michael Morales telephoned him [Willer] and confessed that he [Morales] and Plaintiff Escamilla went to Curie High School and "busted caps with the Kings." Willer further stated that Morales told him that he [Morales] shot at a group of Kings and a kid got killed. Willer stated that Morales told him that he did not care because the Kings had killed another Two-Six street gang member named Michael Fickett.

34.     The statement was false and fabricated. Morales made no such statements to Willer implicating himself or Plaintiff in the shooting that killed Olague. Willer only falsely implicated Morales and Plaintiff out of fear that the physical abuse would continue if he did not do so and that he would be falsely charged with the murder if he did not cooperate with the Defendants. Willer was told that he would not be released from custody until he falsely implicated Morales and Plaintiff.

35.     Defendant Prosecutor SABIN agreed to write out the false statement for Willer to sign, knowing that Willer had been physically abused and threatened with false charges by the Defendant Officers. The Defendant Prosecutors knew that Willer had told them of his mistreatment and that he knew nothing about the shooting. They also ignored his request for a lawyer.

36.     Defendant BIEDER falsely wrote into the statement that the statement was read to Willer out loud and "it is the truth." No one read the statement to Willer, and he never said it was the truth. In fact, Willer told the Defendant Prosecutors that the statement was not true and that he had no knowledge about the shooting.

37.     Phone records would later reveal that Morales never telephoned Willer on February 3, 1993.

38.     Because the Defendant Officers and Defendant Prosecutors knew that Willer would immediately recant the false story once released from custody, they detained him until they could present him to a grand jury to "lock-in" the false story. Willer was ultimately in custody for days on end.

**B.     Arrest and Interrogation of Plaintiff Escamilla.**

39.     After coercing Willer to adopt the Morales phone call fabrication, the Defendant Officers, HALLORAN, BOUDREAU, O'BRIEN, CARROLL, MCGUIRE, and WEISS went to Plaintiff's home sometime between 11:00 and 11:30 a.m. on February 10, 1993. Plaintiff worked the grave-yard shift and was sleeping when the Defendant Officers invaded the home he shared with his pregnant wife and young daughter. With no consent or warrant, the Defendants Officers searched the home and arrested Plaintiff without explanation. Plaintiff had no idea why he was being arrested. The Defendant Officers concealed from his wife where Plaintiff was being taken so that she could not retain an attorney to appear at the police station where Plaintiff was detained.

40.     The Defendant Officers prepared no reports and did not document that Plaintiff was arrested on the morning of February 10, 1993. The Defendant Officers fabricated an arrest report in which they reported that Plaintiff was not arrested until 6:30 p.m. This was a lie.  They fabricated this information to give the false impression that he was in custody fewer hours than he actually was.

41.     Plaintiff was transported to Area One where he underwent a lengthy interrogation by the Defendants Officers designed to force him to falsely implicate himself and others in the

8

shooting of Olague. The Defendant Prosecutors were present at Area One during this abusive interrogation and heard the interrogation.

42.     Once at Area One, Plaintiff was placed into an interrogation room and handcuffed to the wall. Defendant HALLORAN began interrogating Plaintiff and accusing him of being involved in the murder Olague. Plaintiff denied any involvement or knowledge of the shooting and explained that he worked the grave-yard shift and was sleeping at his home on the afternoon of February 2, 1993. Plaintiff explained that his wife could confirm his whereabouts.

43.     Defendant HALLORAN called Plaintiff a liar. He crumpled up a piece of paper and threw it at Plaintiff, telling him he had been working the case for a long time and that one way or another the case was getting closed that day.

44.     Over the course of the next 18 hours, Plaintiff was interrogated by different Defendant Officers, including Defendants HALLORAN, BOUDREAU, O'BRIEN, AND RYAN. They took turns coming in and out of the interrogation room, screaming at Plaintiff, using profanities, calling him a liar, and threatening him – all while telling Plaintiff what they wanted him to say. The Defendant Officers sought to frame Miguel Morales and Tyrone Reyna in the crime because Morales and Reyna were Two-Six gang members, and they were wanted in connection with an aggravated battery they committed shortly before the shooting.

45.     Defendant BOUDREAU and HALLORAN eventually escalated to using physical force against the Plaintiff. They repeatedly punched and slapped him in the head and face. They struck him in his stomach and back side on multiple occasions. Plaintiff repeatedly asked for a phone call or for a lawyer. The beating intensified when Plaintiff tried to assert his *Miranda* rights. Defendant O'BRIEN at one point kicked Plaintiff in the legs and slapped him multiple times in the face.

46.     When the physical abuse did not gain Plaintiff's cooperation, Defendant RYAN began to calmly negotiate with Plaintiff, telling him if he cooperated by making a false statement against Morales and Reyna, he would only be a witness to the crime. Plaintiff pleaded with RYAN to let him make a phone call and again asked for a lawyer. RYAN began getting frustrated when Plaintiff still refused to falsely implicate himself or anyone else. RYAN jumped out of his chair and struck Plaintiff in the head.

47.     The abusive interrogation continued. The Defendant Officers continued to strike Plaintiff, threaten him, and spit on him. The Defendant Officers falsely told Plaintiff he was identified in a line-up and later reported that he was identified by a witness. That statement was false. The Defendant Officers concealed information that they threatened and coerced the witness to "identify" Plaintiff who never testified against Plaintiff.

48.     The Defendant Officers told Plaintiff that if he did not cooperate, he would receive a maximum sentence. Plaintiff still maintained that he had no knowledge or involvement in the shooting.

49.     The Defendant Officers employed a new tactic. They started threatening to arrest and charge his pregnant wife with the offenses of harboring a fugitive and obstruction of justice. They told Plaintiff that his baby would be born in jail and that their daughter would be removed from the home and placed into DCFS custody.

50.     Plaintiff was despondent, hopeless, and terrified because of the threats the Defendant Officers lodged against him and his wife and daughter. After 18 hours of brutal interrogation, Plaintiff eventually agreed to adopt the false narrative that was being fed to him by the Defendants. Only then was he provided with food to eat and an opportunity to use the restroom.

51.     The Defendant Prosecutors were present at Area One during the latter portion of Plaintiff's interrogation. They heard the Defendant Officers screaming and striking Plaintiff. Plaintiff told the prosecutors initially that he did not have any information about the shooting and wanted to speak to a lawyer. The Defendant Prosecutors refused to honor Plaintiff's invocation of his right to counsel and encouraged the Defendant Officers' continued interrogation of Plaintiff.

52.     Eventually the Defendant Prosecutors joined the Defendant Officers when they coached Plaintiff to repeat a narrative that implicated Morales as the shooter and Reyna as his accomplice.

53.     Plaintiff repeated the false narrative that was fed to him by Defendant Officers and Defendant Prosecutors before a court reporter on February 11, 1993, at roughly 5:15 a.m. At the time he made the false statement, he did not believe that he was implicating himself in the crime. The Defendant Officers and the Defendant Prosecutors falsely reassured him that Plaintiff was only a witness to the shooting.

54.     Based on the false narrative fed to him by the Defendants, Plaintiff falsely stated that Morales and Reyna picked him up at his house at around 8:30 a.m. in a brown four-door car with chrome mag wheels. Plaintiff falsely statements that they went to the liquor store to get beer and that Plaintiff then became the driver of the car. Plaintiff falsely stated that he saw Morales with a pistol in his waistband.

55.     Plaintiff falsely stated that they drove by Curie High School and that Morales directed him to make a U-Turn and go back toward Archer Avenue. He falsely claimed that Morales and Reyna began exchanging gang signs with Latin King members and that he drove off and parked the car on Komensky.

56.     Plaintiff falsely claimed that Morales told him to wait there and that he would be right back because they "were going to shoot at the Kings." Plaintiff falsely claimed that Morales, with the gun in his waistband, exited the car with Reyna. Plaintiff falsely claimed that five minutes later he heard gunshots and Morales and Reyna came running back to the car, jumped in and told Plaintiff to "go go."

57.     Plaintiff falsely claimed that Morales told him "I think I shot one of those Kings." Plaintiff also falsely claimed that Morales admitted two days later that he had shot and killed a King.

58.     The Defendant Officers would later fabricate identification evidence against Morales and Reyna. For example, Defendant O'Brien used a very suggestive lineup: He grabbed Raphael Robinson by the neck while Robinson was viewing a lineup and asked him "how many fingers am I holding up." When Robinson answered "three," O'Brien used this to say that Robinson had identified person number three.  In addition, O'Brien spoke with Robinson prior to his trial testimony to explain who committed the murder and where in the courtroom they would be sitting.

**Wrongful Prosecution of Plaintiff Escamilla**

59.     Plaintiff was charged and eventually tried for the murder of Hector Olague.

60.     The State's case consisted entirely of fabricated evidence that was provided by the Defendant Officers and Defendant Prosecutors.

61.     The Defendant Officers testified falsely before a grand jury that Plaintiff was implicated in the crime by a witness and that he voluntarily confessed to his involvement in the shooting. Defendant Offices HALLORAN, BOUDREAU, and RYAN gave false testimony during a hearing on Plaintiff's motion to quash arrest and suppress evidence filed and again at

Plaintiff's trial. The Defendant Officers testified that Plaintiff voluntarily and with no coercion made a court-reported statement that implicated himself and his criminal co-defendants. The Defendant Officers did not reveal that they coerced witnesses and fabricated a narrative that they physically and psychologically coerced Plaintiff into adopting. They also did not reveal that they falsely promised Plaintiff that he would only be a witness to the shooting and not an offender.

62.     Defendant Prosecutor BIEDER also falsely testified at Plaintiff's trial that Plaintiff made a voluntary confession to the shooting. She did not reveal that she assisted the Defendant Officers in coaching a false statement from Plaintiff or that she promised him that he would be treated as a witness to the shooting rather than a perpetrator of the crime.

63.     At no point did any Defendant Officer or Defendant Prosecutor disclose to the criminal justice system, and specifically, Plaintiff or his defense attorney that Willer and other witnesses had been coerced into falsely implicated all criminal co-defendants including Plaintiff. Evidence that the Defendant Officers used physical and psychological coercion to compel a false and fabricated confession from Plaintiff that the Defendants manufactured in order to frame Plaintiff and his criminal co-defendants.

64.     Plaintiff was wrongfully convicted based on the foregoing fabricated evidence and was sentenced to 29 years in prison.

**Plaintiff's Exoneration**

65.     Plaintiff always maintained his innocence and worked tirelessly to prove it. Despite limited education and no resources, Plaintiff attempted to demonstrate his innocence through the filings of post-conviction petitions as a *pro se* litigant.

66.     Armed with new evidence showing a prodigious pattern and practice of misconduct by the Defendant Officers dating back decades, Plaintiff's actual innocence claims

were investigated by the Office of the Cook County State's Attorney. Plaintiff served over 14 years in prison, his entire sentence, and was released on May 27, 2008.

67.     After the Office of the Cook County State's Attorney conducted an independent investigation into this case, it recommended that Plaintiff's conviction be vacated. On October 31, 2023, the Honorable Circuit Court of Cook County Judge Carol Howard vacated the Plaintiff's conviction with the consent of the State. The State immediately moved to vacate Plaintiff's convictions.

68.     Plaintiff obtained a Certificate of Innocence without objection from the State on June 12, 2024.

**Pattern of Misconduct by Defendants Halloran, Boudreau, and O'Brien**

69.     Since his trial and conviction, Plaintiff Escamilla has learned that his experience with the Defendant Officers of Area 1 is not unique. This is not the first instance of Defendants Halloran, Boudreau, and O'Brien using physical and psychological abuse to close a case. These detectives have a long standing pattern of engaging in such misconduct.

70.     For example, the Defendants in this case were directly involved in the framing of four men, known as the "Englewood Four" for rape and murder. Indeed, the same tactics utilized in this case were employed against the defendant, Harold Richardson, who falsely confessed to rape and murder in the now-notorious "Englewood Four" case. In that case, all four convicted men were exonerated when DNA from a serial rapist murderer was discovered at the crime scene; that same DNA excluded all four defendants.

80.     In that same case, Boudreau coerced a false confession from one of Richardson's co-defendants, Terrill Swift. The City of Chicago recently paid over $31 million to settle claims that Defendant Boudreau coerced false confessions from the Englewood Four.

81.     After the Englewood four were exonerated, the FBI discovered an insider's account of how those false confessions were obtained. Former Assistant State's Attorney Terrence Johnson revealed that detectives, including Defendant Boudreau, told the Englewood Four they could go home if they cooperated by confessing to the crime and implicating others. They were told "witnesses go home." Johnson further reported that the detectives created a "cheat sheet" to help them keep their stories straight when testifying at the subsequent motion to dismiss brought by the Englewood Four.

82.     The Detectives were successful. The motions to suppress were denied and the Englewood Four were convicted despite, just as here, no forensic evidence existed inculpating them. Fortunately, advanced DNA testing helped exonerate the four.

83.     Defendant Boudreau is one of the notorious homicide detectives who, under former Chicago Police Commander Jon Burge, had a lengthy history of physically and psychologically coercing suspects to "confess" to serious violent crimes.

84.     In total, Defendant Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the "confessions."

85.     In an examination of thousands of murder cases in Cook County from 1991 through 2000, *The Chicago Tribune* found that Defendant Boudreau and many of his colleagues had been involved in a wide range of cases that ultimately collapsed even though they had obtained confessions.

86.     As *The Chicago Tribune* observed, "Boudreau stands out not only for the number of his cases that have fallen apart, but for the reasons. In those cases, Boudreau has been accused by defendants of punching, slapping or kicking them; interrogating a juvenile without a youth

officer present; and of taking advantage of mentally retarded suspects and others with low IQs."
See "Veteran Detective's Murder Cases Unravel," *The Chicago Tribune*, December 17, 2001,
available at https://www.chicagotribune.com/investigations/chi-011217confession-story.html
(last visited on July 18, 2023).

87.     For a two-year period in the early 1990s, Defendants Boudreau and his partners
helped "solve" at least five murders with "confessions" that ended with acquittals. All of these
suspects alleged that Defendant Boudreau and/or Defendant Halloran mistreated them to obtain
false confessions.

88.     The list of abuses by Defendant Officers Halloran, Boudreau, and O'Brien
include the following, all of which are corroborated by sworn testimony:

a.  In 1988, Defendant Halloran and a partner struck Mickey Grayer in the stomach and
    groin with a flashlight and punched and choked him.

b.  In 1990, Cortez Brown was tortured by Defendant O'Brien into confessing to two
    murders with which he had absolutely nothing to do. Defendant O'Brien, along with
    Detectives John Paladino and Anthony Maslanka, beat Brown about his head and
    body, including with a flashlight. Brown was denied food and his right to an attorney.

c.  In September 1991, Defendant Boudreau and others physically and emotionally
    abused 15-year-old Anthony Jakes in order to coerce a false confession for a murder
    Jakes did not commit. During the over 16 hours Jakes was held and interrogated,
    Boudreau and others slapped, punched, and kicked Jakes, threatened to recruit gang
    members to kill his family, tried to burn Jakes with cigarettes, and deprived him of
    access to food, water, and contact with an attorney or family member. Jakes was
    convicted of the murder based on his false confession. In 2018, his conviction was

vacated, and Jakes filed a federal civil rights lawsuit against Boudreau and his cohorts.

d.  In 1991, fifteen-year-old John Plummer was interrogated for 36 hours by Defendants Boudreau, Halloran, and others. After being physically beaten, he falsely confessed to a murder. Defendant Halloran has taken the Fifth Amendment regarding Plummer's allegations.

e.  Defendant O'Brien coerced a signed false confession out of Javan Deloney in 1991. The detectives denied his right to an attorney and used physical violence to coerce the confession, hitting him in the chest and slapping him in the face. This, all despite his insistence that he was not involved in the murder.

f.  In 1991, Defendant Boudreau obtained a murder confession from Alfonzia Neal, testifying that Neal waived his rights and signed a statement handwritten by a prosecutor. Experts established that Neal had an IQ in the 40s and that he was incapable of intelligently waiving his Miranda rights. Neal was acquitted at trial notwithstanding his signed confession.

g.  Gregory Logan was interrogated regarding a murder in 1991 by Defendant O'Brien, and other officers. When he professed his innocence, the detectives beat him with a bat, pushed his head against the wall an pointed a gun to his head. He was also denied the right to an attorney.

h.  In 1992, Arnold Day was interrogated in connection with a murder investigation. After isolating Mr. Day in an interrogation room for hours, Defendants Boudreau and others forcefully grabbed Day by the neck and choked him. The detectives also threatened to throw Day out the window. Day ultimately confessed but was

nonetheless acquitted of the murder after presenting compelling allegations of police torture.

i.  In November 1992, Defendants Boudreau, Halloran, and O'Brien jointly induced Harold Hill, Dan Young, and Peter Williams to provide interlocking confessions to raping and killing a woman. Notably, records revealed that despite confessing to murder, Williams was actually incarcerated at the time of the crime. Because of his demonstrated innocence, Williams was never charged. Hill and Young, however, were convicted although their confessions implicated Williams, who was undeniably innocent. Again, later DNA evidence exonerated Hill and Young, leading to their release from prison.

j.  In 1992, Clayborn Smith was interrogated for 37 hours about a murder he knew nothing about. When Mr. Smith professed his innocence, another detective kicked and punched his head and body, and Defendants Boudreau, Halloran, and O'Brien threatened to charge Mr. Smith's pregnant girlfriend if he did not confess. The detectives also grabbed Smith's neck, pulled his hair, and yanked his fingers back. At the end of the 37 hours, Smith falsely confessed. In pending post-conviction proceedings, the Court barred the state from denying that Boudreau and Halloran engaged in a pattern of abuse between 1990 and 2001.

k.  In 1992, Kilroy Watkins was arrested and handcuffed to a metal ring in an interrogation room by Defendants Boudreau and Halloran, who then choked and punched him in order to get him to confess to a shooting. After more than 30 hours in this room with minimal sleep and food, Watkins signed a false incriminating statement.

l.  In May 1993, Terry King and Tyrone Hood were arrested for the murder of Marshall Morgan Jr. Detectives Foley and Lenihan tried to get King to confess by beating him about his face and body – just as Tyler was beaten here. King was left with a black eye, bumps on his head and lacerations inside his jaw. King was ultimately released without being charged when his alibi cleared.

m.  Tyrone Hood was beaten about the body by Boudreau, Ryan, Lenihan and Foley while he was held at the lockup at 51st and Wentworth. Hood was also interrogated by Boudreau and Halloran. So too for the witnesses in Hood's case, a number of whom alleged the Defendants physically or psychologically coerced him. Hood has been granted a Certificate of Innocence, and his civil lawsuit against Defendants Ryan, Lenihan, Boudreau and Halloran recently settled.

n.  Hood's co-defendant was a man named Wayne Washington. Washington alleged that he was held for two days. During that time, he was handcuffed, slapped in the face, had his chair knocked out from under him, threatened, and not given food or water until he agreed to give a false and fabricated statement inculpating himself and Hood in the murder. Washington has also been granted a COI, and his civil lawsuit against Defendants Ryan, Lenihan, Boudreau and Halloran recently settled.

o.  In 1993, Emmett White was arrested by Defendants O'Brien, Clancy, Halloran and other detectives who hit him in the face, punched him in the body, threw him to the ground and stepped on his face, dragging his head across the floor of the interrogation room, all in an attempt to get him to falsely confess. Photographs of Mr. White corroborated his testimony of his abuse. Although the police alleged that White

confessed to the crime, when asked about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

p. In 1993, Richard Anthony was forced to confess to murder by Defendant Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

q. Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Defendant Boudreau and his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

r. When asked about their interrogation and coercion of Escamilla, Morales, Willer and Robinson during a deposition in a civil suit, O'Brien and Halloran refused to answer any questions for fear of subjecting themselves to criminal liability.

s. In December 1993, Defendants Boudreau and O'Brien, with other detectives, "closed" two separate murders by coercing confessions from two intellectually disabled juveniles, Fred Ewing and Darnell Stokes, classmates in special-education courses. One expert concluded that Ewing "was unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted despite the confessions obtained by those Defendants.

t. In 1994, Defendant Halloran and other police officers forced Sheila Crosby and Michael Sardin to identify Shondell Walker as the murderer in their grand jury testimonies. Halloran threatened to have the Department of Children and Family

Services take Sheila Crosby's children away from her. They told Sardin that if he did not name Walker, he would be charged with the murder.

u. In 1993, Richard Anthony was forced to confess to murder by Defendant Boudreau's partner, who beat Anthony and denied him food, sleep, and use of the restroom in order to coerce Anthony into giving a false statement.

v. Richard Anthony's co-defendant, Jerry Gillespie, was also beaten by Defendant Boudreau and his partner during his 30 hour interrogation, which included preventing him from contacting an attorney or his family and refusing to allow him to use the bathroom. As a result of the abuse, coercion and intimidation, Gillespie eventually gave a false confession.

w. Derrick Flewellen signed a confession coerced by Defendants Boudreau, Halloran, and others after being interrogated for more than 36 hours, during which time he was slapped, kicked punched, and slammed into the wall by Boudreau and other detectives before succumbing to their coercion. After spending almost five years in prison, Flewellen was acquitted of the two murders when DNA tests proved the crime was committed by someone else.

x. In 1994, Defendants Boudreau, Halloran, Moser, and Graf beat Anthony Williams into falsely confessing to murder and armed robbery.

y. In 1994, Jamie DeAvila was arrested for murder and interrogated by Boudreau. When DeAvila explained that he was not involved in the crime, Boudreau barked back that it did not matter because Boudreau "was going to plant a nigger and the crime scene to point [him] out as the driver of the murderer." DeAvila eventually falsely confessed to murder.

z.  In August 1994, David Wright was arrested and coerced into giving a false

confession. Wright has alleged that Boudreau physically assaulted him, including

choking him and shoving him against the wall, and made a false promise of leniency.

As a result, and after an extended period in custody, Wright falsely confessed.

Following an evidentiary hearing, in 2022, that confession was suppressed, and the

State dismissed all charges against Wright.

aa. In 1995, Defendants Boudreau, Halloran, and O'Brien interrogated and coerced

confessions from Oscar Gomez, Eric Gomez, and Abel Quinones. Their tactics

included holding all three men for 30 hours, beating them while they were shackled

to the wall, and preventing them from communicating with an attorney or their

families, all in a successful attempt to coerce false confessions. All three defendants

were found not guilty, based largely on the conclusion that the detectives physically

coerced their confessions.

bb. In 1995, Defendants Boudreau and Halloran were part of a team of detectives who

physically abused John Wright until he agreed to implicate Malik Taylor and Michael

Taylor in connection with a murder.

cc. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran and Boudreau

interrogated him, they physically and psychologically coerced him until he lied and

implicated Eric Gibson, a man who had absolutely nothing to do with the crime.

Since his interrogation, Little has fully recanted the statement he gave to police.

dd. In 1996, Defendant O'Brien caused to individuals at the scene of a crime to falsely

identify Jeremy Allen. Allen was ultimately acquitted at trial.

ee. In February 1997, Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by Defendant O'Brien. O'Brien withheld evidence from the victim that another man, one who exactly fit the description of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

ff. After police officer Michael Ceriale was shot to death in 1998, Defendant Boudreau and other detectives arrested Jonathan Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating (unwritten and unsigned) statements. Tolliver was never advised of his rights, no miranda waiver was created, and his request to speak with a lawyer and/or his mother were refused. Boudreau claimed that the protections for minors were not utilized because Tolliver, who was 16 years old, had lied about his age, falsely claiming to have been eighteen. After two trials, Tolliver was convicted of Ceriale's murder.

gg. In connection with the Ceriale murder, Defendant Boudreau, among others, coerced statements from other witnesses to incriminate Tolliver. The means of coercion included an intentional withholding of insulin from one diabetic witness for more than 24 hours. When these witnesses later refused to testify at trial consistent with the false statements coerced by Boudreau, the State charged five of them with perjury and at least one of them went to jail for it.

hh. In 1998, Defendants O'Brien and Halloran punched Antoine Anderson in the lip and chest, threatened to take away his children, and denied him his right to an attorney. At the time Mr. Anderson was 17 years old and could barely read or write.

ii. In 1998, Defendants Boudreau and Halloran held Joseph Jackson in an interrogation room in connection with a murder. When Jackson refused to confess, Defendants Boudreau and Halloran placed a book on his chest and stomach and hit the book with a blackjack, so as not to leave visible marks on Jackson's body. Meanwhile, Defendants Boudreau and Halloran, using a torture technique referred to in the Department as "bagging," placed a typewriter cover over Jackson's head and cut off his air supply. As a result of this coercion, Jackson eventually confessed to a murder he did not commit.

jj. In 1998, Defendant Boudreau helped get a murder confession from a 13-year-old boy with a verbal IQ of 59. The judge later ruled that the boy did not have the mental capacity to waive his rights and threw out the confession. Prosecutors then dropped the charges.

kk. Christopher Holly filed a federal civil rights lawsuit against Defendant Boudreau and other detectives alleging that he was framed for a murder in 1998.

ll. In May 1994, Fabian Pico was 16 years old when he gave a self-incriminating statement to Boudreau and another detective that was used to convict him of murder. When Pico moved to suppress the statement on the grounds that police did not allow him access to his mother, Boudreau claimed he had tried unsuccessfully to reach Pico's mother by phone before Pico confessed; but Boudreau's supposed attempt was not memorialized anywhere in his reports.

24

mm.    In 1994, Nevest Coleman, an educated man with no criminal record, was arrested for a rape and murder he did not commit. Given that the body was buried in the basement of Coleman's apartment building, Boudreau, Halloran, Foley and Clancy set their sights on Coleman. Coleman repeatedly denied his involvement in the rape and murder, which was met with punches to Coleman's face. Eventually, the officers fed Coleman details about the crime and Coleman falsely confessed to being a lookout. In 2016, DNA evidence exculpated Coleman and his co-defendant. In 2017, Coleman was exonerated and the state dismissed all charges.

nn. Richard Malek alleges that Defendant Boudreau and other detectives kept him in an interrogation room for four days, depriving him of sleep, food, and access to lawyers, as well as using violence (they knocked out his tooth) and threats to shoot him (Russian Roulette) in an attempt to coerce his confession. Boudreau participated in this coercion, but played the "good cop," uncuffing Mr. Malek and providing him with a McDonalds hamburger after he had been starved for an extended period. When they falsely claimed to have obtained an "oral" confession, Mr. Malek filed a federal lawsuit against Defendant Boudreau and others.

oo. In 1996, Andre Brown was handcuffed to a wall, threatened that he would never see family again if he did not confess to the shooting, was denied his request to speak with his mother or an attorney and was denied access to the restroom, all by Defendants Boudreau and Halloran and their brother officers.

pp. Marcus Wiggins brought a lawsuit against Defendants Boudreau, O'Brien and others alleging that he was handcuffed to a wall and beaten in an interrogation room while being questioned with a group of youngsters in a 1991 murder case. The detectives

denied Wiggins's mother access to her son, who was a 13-year old eighth grader at the time of the coerced confessions. The other young suspects also gave confessions, many of them after being physically beaten as well. For example, Jesse Clemon and Iamari Clemon alleged that they were struck about their bodies, including with fists and flashlights. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that Boudreau testified he did not hear. All of the defendants were either acquitted or had their cases *nolle prosequied* by the State. In civil depositions in an unrelated lawsuit, O'Brien and Halloran took the Fifth Amendment when asked questions about the torture of Marcus Wiggins and his co-defendants.

qq. As mentioned above, after being beaten by Defendants Boudreau and O'Brien, Jesse Clemon signed a written statement with his left hand (because his right hand had been injured). Witnesses in the station heard hollering and protests of "I didn't do it." Boudreau testified that the statement was not coerced, but the judge suppressed it anyway due to the "horrendously oppressive" atmosphere at the station. During their investigation, Defendants Boudreau and O'Brien also threatened, beat, and electroshocked Jesse's brother, Demoni, and beat his other brother, Iamari, with a flashlight.

rr. Defendant O'Brien also slapped Curtis Mislap in the face, kicked him in the testicles while he was handcuffed, and threatened him. Milsap falsely confessed and was later acquitted.

ss.  In 2004, Defendant Boudreau was involved in the illegal search and seizure of
Francis Bell. Defendant Boudreau beat Bell into signing a consent to search after
Defendant Boudreau already did the illegal search.

89.     There are many other examples of similar misconduct by these same Defendant
Officers.

90.     The codefendants and witnesses involved in the investigation of the crime for
which Plaintiff was convicted make similar allegations against the Defendant Officers. As also
briefly mentioned above, Antoine Ward accused officers Halloran and O'Brien of stepping on
his left hand, hitting him on the head, and refusing to let him use the restroom while he was in
interrogation for over 48 hours until he eventually urinated into a desk drawer.

91.     Kenneth McGraw claims that Defendant Boudreau beat him until he agreed to
give a statement implicating the men who were eventually convicted, including Plaintiff.

92.     Michael Taylor accused Defendants Halloran, Clancy, Boudreau and Moser of
handcuffing him to a coat rack, slapping him, kicking him in the groin, punching him in the
head, and dropping him to the floor. He claims he was never read his Miranda Rights and was
denied access to an attorney. He was given a statement to sign that was not true and included
information he never provided.

93.     Reginald Henderson and his brother Sean Tyler were beaten by Defendant
Boudreau, Halloran, and O'Brien until they both made false inculpatory statements that were
used to wrongly convicted them. Bother brothers were later exonerated and received Certificates
of Innocence.

**The City of Chicago's Policy and Practice of Prosecuting Innocent People in Violation of their Constitutional Guarantees**

94.     The Chicago Police Department is responsible by virtue of its official policies and practices for scores of miscarriages of justice like those its employees inflicted on Plaintiff.

95.     Since the 1980s no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit.

96.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to, using physically and psychologically coercive tactics to obtain involuntary and false confessions, fabricating evidence, concealing exculpatory evidence, manipulating or threatening witnesses to influence their testimony —all to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

97.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated evidence against innocent people by coercing (physically and psychologically), manipulating, threatening, pressuring, and offering inducements to suspects and witnesses.

98.      As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of an innocent person.

99.     In 2019, the Federal Bureau of Investigation and Department of Justice admitted Chicago Police Department supervisor, Jon Burge—a supervisor for the Officer Defendants at

one point—was aware that on numerous occasions that detectives he was supervising participated in the torture and physical abuse of persons being questioned.

100.    Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

101.    The municipal policy and practice set out in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terrence Johnson. The report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, and physically abused witnesses.

102.    In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

103.    Before and during the period in which Plaintiff was falsely charged with the Hector Olague murder, and later convicted of the murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against officers accused of violating civilians' civil and constitutional rights. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

104.    As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In

accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

105.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Officer Defendants here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

106.    The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a.  The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

b.  The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c.  The risks of engaging in tunnel vision during investigation.

d.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

107.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

108.    The City's failure to train, supervise, and discipline its officers, including the Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Mr. Escamilla in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

109.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

110.    The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

**Plaintiff's Damages**

111.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff was incarcerated for 15 years for a crime he did not commit. He woke up each day with this

reality, not knowing whether he would see his family outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

112. Over the course of his 15 years of imprisonment, Plaintiff was separated from his loved ones, including his daughter, infant child, and his wife when Plaintiff was wrongfully arrested. He grieved the loss of some of those loved ones who he was never able to embrace again after the Defendants took him from his life on February 10, 1993. Plaintiff experienced the heart-aching pain of missing his young daughter and infant daughter grow up. When Plaintiff went to prison, his wife was pregnant with their son. He was not present when his son was born and missed being a part of raising him.

113. As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

## COUNT I
## 42 U.S.C. § 1983 – Coerced (False) Confession Under Fifth and Fourteenth Amendments

114. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

115. As more fully described above, the individual Police Officer Defendants and Defendant Prosecutors acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by using violence, threats of violence, trickery, manipulation, and deceit to compel Plaintiff against his will to make or adopt statements that were later used to convict him.

116. In the manner described more fully above, Defendants coerced Plaintiff to make or adopt statements that were introduced as inculpatory evidence for crimes they knew he did not

commit. Defendants falsified police reports and gave false testimony before a grand jury and at trial about the misconduct they used in securing this false evidence. They failed to correct the fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

117. The Police Officer Defendants and Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

118. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Hector Olague. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

119. Notwithstanding its effect on the outcome of the trial or even the truth or falsity of the statements, the mere use of Plaintiff's physically coerced statements at his trial violates his Fifth and Fourteenth Amendment rights against compelled self-incrimination.

120. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

121. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

122. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT II**
**42 U.S.C. § 1983 – Fabrication of Evidence**

123.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

124.     As more fully described above, the Police Officer Defendants and Prosecutor Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements and by fabricating statements John Willer and Plaintiff's own false confession that were introduced into evidence at Plaintiff's trial.

125.     In the manner described more fully above, Defendants fabricated, coerced, and strong-armed, manipulated a court reported statement from the Plaintiff that he signed under duress to stop the abusive interrogation. That fabricated statement was introduced against him as evidence at trial.

126.     In the manner described more fully above, Defendants fabricated, manipulated and/or solicited false statements from John Willer implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using this false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

127.     The Prosecutor Defendants fabricated false oral statements and later a court-reported statement from Plaintiff.

128.     The Police Officer Defendants and Prosecutor Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

129.     Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Hector Olague. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

130.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

131.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

132.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT III
### 42 U.S.C. § 1983 – *Brady* Violations

133.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

134.     As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

135.    The Prosecutor Defendants, while acting in an investigatory function, also withheld exculpatory evidence from Plaintiff during the pendency of his criminal proceedings, up to and including the time of Plaintiff's conviction.

136.    The Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 26 years in prison for a crime he did not commit.

137.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

138.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

139.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT IV**
**42 U.S.C. § 1983 – Malicious Prosecution and Prolonged Unlawful Detention**

140.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

141.    In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

36

142.     The Defendants, including the Prosecutor Defendants, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

143.     In so doing, the Defendants caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

144.     The Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

145.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

146.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

147.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

148.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

149.     All of the Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

150.     All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

151.     In this manner, the Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

152.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

153.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

154.     As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

155. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT VI**
**42 U.S.C. § 1983 – Failure to Intervene**

156. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

157. In the manner described above, one or more of the individual Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

158. These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

159. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

160. As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

161. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII
### 42 U.S.C. § 1983 – *Monell* Policy Claim

162.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

163.    The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 100 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

164.    The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that the Defendant Officers employed against Plaintiff in this case, including: (1) physical abuse and coercion to procure an inculpatory statement/confession; (2) the fabrication of false oral statements; (3) concealment of exculpatory evidence; (4) physical abuse/coercion and manipulation of witnesses in order to obtain false statements against Plaintiff; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

165.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically used prolonged physical violence and psychological coercion to force suspects to make false inculpatory and incriminating statements against themselves. As a matter of widespread custom and practice, these physically coerced statements from criminal defendants were routinely used to convict defendants at trial.

166.    Consistent with the municipal police and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, used physical violence and psychological coercion to overcome Plaintiff's will and force him to

regurgitate a false and fabricated confession that was later used as the primary piece of evidence against him.

167.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

168.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Plaintiff's alleged handwritten statement was involuntary and procured through physical coercion, that Kenneth McGraw's statement was procured through physical violence, manipulation, threats and coercion, and that certain oral statements attributed to the Plaintiff were fabricated in their entirety.

169.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false evidence against suspects.

170.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants,

manipulated, tricked, and improperly influenced the testimony of Willer to falsely implicate Plaintiff in the shooting of Hector Olague.

171.    The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

172.    Prior to and during 1993, the year in which Plaintiff was falsely charged with the Olague's murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

173.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

174.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent

persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

175.    The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the physical coercion of fabricated confessions, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which the Defendant Officers have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

176.    The City of Chicago and its Police Department failed in 1994 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

    a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

    b.    The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

    c.    The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

      d.      The risks of wrongful conviction and the steps police officers should take to minimize risks.

      e.      The risks of engaging in tunnel vision during investigation.

      f.      The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

177.    The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

178.    The City's failure to train supervise and discipline its officers, including repeat offenders such as the Defendants in this case effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

179.    The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

180.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

181.    The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

      a.    conducting physically and psychologically or otherwise illegal or improperly coercive interrogations of suspects and witnesses in order to obtain false statements and wrongful convictions.

      b.    manufacturing and fabricating false suspect and witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

      c.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, and otherwise covering up the true nature of those interviews and/or interrogations.

      d.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and

arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the Defendants in this case.

    e.     perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

182.     The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

183.     As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

184.     The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

## COUNT VIII
## State Law Claim – Malicious Prosecution

185.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

186.     All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

187.     The Defendants accused Plaintiff of murdering Hector Olague, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers and Prosecutor Defendants knowingly made false statements to the trial prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

188.     The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

189.     As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT IX
## State Law Claim – Civil Conspiracy

190.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

191.     As described more fully in the preceding paragraphs, the Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to

accomplish an unlawful purpose by unlawful means. In additional, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

192.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

193.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotion distress, were accomplished by Defendants' conspiracy.

194.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

195.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT X
## State Law Claim – Intentional Infliction of Emotional Distress

196.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

197.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

198.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

199.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

200.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XI
## State Law Claim - Willful and Wanton Conduct

201.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

202.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

203.     Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

204.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XII
## State Law Claim – *Respondeat Superior*

205.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

206.     When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

207.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

208.     When the Prosecutor Defendants committed the acts alleged in this Complaint, they were members of the office of the Cook County State's Attorney, an agency of Cook County, Illinois, acting at all relevant times within the scope of their employment and under color of law.

209.     Defendant Cook County is therefore liable as principal for all torts committed by its agents, Defendants Sabin and Bieder.

**COUNT XIII**
**State Law Claim – Indemnification**

210.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

211.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

212.     The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

213,     Similarly, Defendant Sabin and Bieder are or were employees of the Cook County State's Attorney's office, an agency of Cook County, Illinois, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff Nick Escamilla prays this Court enter judgment in his favor and against Defendants Kenneth BOUDREAU, John HALLORAN, James O'BRIEN, Bernard RYAN, Robert A. MCGUIRE, Gerry CARROLL, Ellyn WEISS, former Assistant State's Attorneys Paul SABIN and Sherry BIEDER, and the CITY OF CHICAGO, and COOK COUNTY.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

**NICK ESCAMILLA**

By:    <u>/s/JENNIFER BONJEAN</u>
*One of Plaintiff's attorneys*

BONJEAN LAW GROUP
Jennifer Bonjean
Ashley Cohen
750 Lexington Avenue, 9th Floor
New York, New York 10022
(718) 875-1850

<u>**Chicago Office:**</u>
Bonjean Law Group, PLLC
53 W. Jackson Blvd., Ste. 315
Chicago, Illinois 60604